Filed 3/13/24  P. v. Franklin CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIS PETER FRANKLIN,<br><br>    Defendant and Appellant. | A165893<br><br>(Alameda County Super. Ct. No. 18CR013820) |

Defendant Willis Peter Franklin appeals from a sentence of 62 years to life, imposed after a jury found him guilty of multiple sexual offenses against three victims, along with several weapons charges.  Franklin asserts that his constitutional right to counsel of his choice was denied when the trial court refused to continue his trial for one day, instead requiring one of his two attorneys to appear remotely pending Polymerase chain reaction (PCR) test results for COVID 19.  Defendant also contends that his Sixth Amendment rights were violated because he was not allowed to decide for himself whether to testify in his own defense at trial and was not properly advised by the court of that right.  We affirm.

# I. FACTS AND PROCEDURAL HISTORY

On August 30, 2021, the Alameda County District Attorney filed the operative second amended information in this case, charging Franklin with 10 felonies: continuous sexual abuse of a child under the age of 14 with respect to Jane Doe One (Pen. Code,[1] § 288.5, subd. (a), count one); lewd and lascivious acts on Jane Doe Two, a child under 14 years of age (§ 288, subd. (a), counts two and three); rape of an unconscious person, Jane Doe Three (§ 261, subd. (a)(4), count four); forcible oral copulation of Jane Doe Three (former § 288a, subd. (c)(2)(A); see now § 287, subd. (c)(2)(A), count five); forcible rape of Jane Doe Three (§ 261, subd. (a)(2), count six); sexual battery by restraint on Jane Doe Three (§ 243.4, subd. (a), count seven); two counts of possession of a firearm by a felon on August 24, 2018 (§ 29800, subd. (a)(1), counts eight and nine); and possession of a firearm by a prohibited person (§ 30305, subd. (a)(1), count ten). As to counts one through six, enhancements were alleged pursuant to section 667.61 (the One Strike law) that Franklin was convicted in the present case of qualifying offenses against more than one victim. The operative information additionally alleged that Franklin had been convicted of bank robbery (18 U.S.C. § 2113) in 1989 and received a prison term for that offense. Count seven was later dismissed for insufficient evidence.

## A. *Trial*

The jury trial was held over 17 days in September and October 2021. Franklin was represented at trial by two attorneys, Brian Ford and Maria Belyi. Brian Ford gave the opening statement for the defense on September 2 and 3, 2021 and argued against a prosecution motion during the direct

---

[1] All statutory references are to the Penal Code unless otherwise specified.

examination of the first witness on September 3. That same day, Belyi objected to testimony, argued regarding the admission of certain evidence, and later conducted the cross examination of the first witness. Belyi also questioned Jane Doe Three during a section 402 hearing. On the next court day, September 7, Belyi objected throughout the direct testimony of Jane Doe Three and then conducted her cross-examination. On September 8, 2021, Ford notified the court early in the morning that he was experiencing symptoms consistent with COVID 19. The court informed the jury that Ford was ill, and the matter was continued to the next day.

By September 9, 2021, both Franklin and Belyi (the two who sat at the same table with Ford) had both tested negative. Ford, who was still feeling unwell, tested negative with a home test kit but appeared remotely via a video platform as he was still awaiting the results of his PCR test. The trial court expressed a general concern about moving the matter along expeditiously and additionally opined that, "under the circumstances we find ourselves in with the concerns about the pandemic and COVID infections . . . the longer this case goes on it's only going to get more complicated in that regard." The court further noted that it had asked the jury members to send it a message if any of them "had concerns about their ability to carry forward" given the "developments over the last 24 hours," and none of them had. The court concluded that it felt like "a necessity" to proceed for the remainder of that court day (it was already 11:33 a.m.) with Beyli present in court and Ford participating in the proceedings on the court's video platform. It did not see any prejudice to Franklin in Belyi continuing her cross-examination of Jane Doe Three in an effort to complete the witness examination that day.

Belyi objected to going forward without Ford physically present, arguing that they worked as a team and assisted each other in a way that

was not possible over video. She noted that Ford's face had been frozen during a previous hearing and was concerned technical malfunctions might prejudice how the defense was viewed by the jury. She also emphasized the seriousness of the case and Franklin's right to have both of his retained attorneys present. The trial court responded that it had observed the two attorneys working together equally and believed Belyi to be "quite capable" of handling matters. While the defense was only asking for a one-day continuance, Belyi acknowledged that it was not a certainty Ford would be well by the next day or test negative. Belyi also clarified that, when she examined a witness, Ford helped her with follow-up questions and by filtering notes from Franklin to provide her with those he deemed important. Ford contributed by citing several cases to the court regarding a defendant's right to retained counsel of choice and argued that the situation could lead the jury to view him as disposable.

While it recognized that the situation was not "ideal," the court could not imagine the jury thinking that Ford was dispensable or that Franklin could be prejudiced by the situation, given Ford's prior conduct in court and his understandable need to isolate. Indeed, the court believed Ford's willingness to dress in his suit and appear remotely even while ill would show the jury how important the case was to Franklin and Ford. The court emphasized that Ford would be visible to the jury on the court screen unless it was being used to show exhibits and that he would be listening in and able to contribute to the proceedings. It stated its willingness to allow Belyi and Ford to communicate by phone, text, or in a breakout room at "appropriate points." Ultimately, the trial court denied defense counsel's request to continue the matter to the next day so that Ford could be physically present.

The trial day moved forward with Belyi finishing her cross-examination of Jane Doe Three, the prosecutor completing his redirect examination, and Belyi conducting a re-cross examination. The prosecutor then began his direct examination of Jane Doe One. Ford tested negative and returned to court the next day.

On October 6, 2021, the jury found Franklin not guilty on count four and guilty on all other counts. It found true all special allegations.

## B.    *Motion for New Trial*

In July 2022, Franklin—represented by new counsel—filed a motion for new trial on grounds that he had not been advised by prior counsel that it was his personal decision whether or not to testify at trial. The motion additionally argued that the trial court had a duty to advise Franklin on the record that the decision whether or not to testify was his to make, and the court had not done so. According to Franklin, since the identified errors were structural, a new trial was required. Attached to the motion were several declarations. Franklin's declaration stated that he repeatedly told his attorneys (Ford and Belyi) that he wanted to testify and that "[his] attorneys never told [him] that it was [his] right to decide whether or not to testify." In contrast, both Ford and Belyi declared that they had advised Franklin that it was ultimately his choice whether or not to take the stand at trial.

In its opposition to the new trial motion, the prosecution argued that California courts have explicitly rejected for decades the notion that defendants should or must be advised of their right to testify by the trial court. In support of its argument that Franklin agreed with his trial counsel not to take the stand, the prosecution submitted a transcript from a jail house call between Franklin and his mother discussing a colloquy in court regarding whether Franklin would testify. In relevant part, it reflects

5

Franklin's understanding of the decision as follows: "[The] judge asked them if they had any other witnesses, and they told him, and then, he, you know, he argued about that. He said, 'well, what about your client? Is your client goin' testify?' And I looked at him, and he was like, 'don't you say nothin' to me. Don't say nothin'. I can't ask you, and you can't talk to me.' And they looked at each other, and they said, 'no, we don't think he's gonna' testify. We don't think'—and then, Maria came over 'cuz she know what I said about that. Same thing Tina said, and she said, 'Look, I know—she's compassionate. She wants to do this, and your compassionate, and we know you want to, but you know, we really just want you to listen to us right now. Just listen to us. Let us do this.' I was like, 'okay, handle your business. Handle your business.' " After an unclear response from his mother, Franklin opined: "I think they did good—" Defense counsel argued in reply that the excerpt actually proved the opposite from what the prosecutor maintained—that Franklin thought it was his attorneys' decision whether or not he testified.[2]

The court held a hearing on the new trial motion on July 25, 2022. Franklin testified that he was not advised by his attorneys that he could "override or veto" the decision made by them regarding whether he would take the stand. With respect to the discussion in court regarding whether he would testify, Franklin stated: "[The judge] looked back at the two lawyers,

_____

[2] A number of excerpts from jury voir dire were also before the court and were equally equivocal. Some comments suggested it was Franklin's personal decision whether to testify—e.g., "[']But a defendant's decision not to, if that's what happens, I don't know, but if Mr. Franklin chooses not to testify, I won't ask him why.[']" (Italics omitted.) Others implied it was a defense decision—e.g., his lawyers may say " '[t]here's no reason for you to get up there. That may be a determination they make a couple of days from now, there's no reason to testify, not after all that evidence.' " (Italics omitted.)

Ms. Belyi and [Ford] and they looked back and forth at each other until ultimately they decided that I would not testify. That was the first time that the decision was made. Up until then Mr. Ford was for my testifying and Ms. Belyi was not. But that was the first time the decision was actually made. They made it and no one asked me anything else."

Franklin acknowledged that Belyi walked over and said to him: "I know this is what you want to do but just listen to us; we don't want you to testify." He also recalled Ford telling him at some point: "[S]itting on the witness stand a witness can say one thing and blow the whole case. Right now they haven't proven their case so we don't need to do this." When Franklin told his attorneys to handle their business, he meant for them to make the decision like they had other decisions with respect to trial tactics. He did not "think [he] had a choice in it." He did not recall Belyi ever saying that it was his choice.

The court then asked Franklin: "[Belyi] didn't say anything to the effect of we don't care what you think, this decision has been made by Mr. Ford and I. We don't want to hear what you have to say. It's none of your business. She didn't say anything like that. She said 'listen to us.' Listen to our advice on this topic." Franklin agreed that was what Belyi said. When defense counsel objected to the court's questions, the court replied: "The point I'm making is your client's own testimony is that his lawyer said to him 'listen to us.' That suggests to me his agency in the decision. Not that this was pressed upon him, a decision taken from him. His own testimony is consistent with their declaration."

Belyi testified that she recalled talking with Franklin around five times during her representation of him regarding whether or not he would testify at trial. She advised Franklin more than once that it was his right to decide

7

whether or not he would take the stand.  Specifically, Belyi believed she said "that it's ultimately up to [him] and that he [could] testify even if we disagree[d] with that path."  Belyi also advised Franklin that she did not think he should testify, explaining that his testimony would open the door for the admission of evidence that would be damaging to his case.  From her recollection, Franklin ultimately agreed to go along with her advice.  Belyi did not secure an actual waiver from Franklin of his right to testify.  Had Franklin insisted on testifying, she would have allowed it.

Ford testified that he spoke with Franklin more than five times about testifying in his case and advised him more than once that it was his decision whether or not he testified at trial.  He consistently gave Franklin his "very strong" opinion that he should not take the stand in his own defense.  However, if Franklin had insisted on testifying, he would have allowed him to do so.  Ford admitted that he never formally voir dired Franklin about his decision whether to testify.

After argument, the trial court denied the motion for new trial.  It noted there was no dispute that Franklin was not questioned on the record by either counsel or the court regarding his personal right to choose whether to testify.  But it rejected Franklin's argument that such a failure, in itself, required reversal.  The court went on to find both Belyi and Ford credible, accepting their testimony "that they did on a number of occasions adequately advise Mr. Franklin of his right to testify and that the choice in that matter was his."  The court continued:  "So in regard to any credibility calls I just want to say that that was the Court's finding and I in essence believe that Mr. Franklin's position really is one of regret that he did not testify as opposed to a position where he did not understand that he had the right to override his lawyers' advice on that point."

8

Thereafter, at the sentencing hearing on August 8, 2022, the court imposed a total term of 62 years to life under the One Strike Law—four consecutive terms of 15 years to life (counts one, two, five, and six) to run consecutively to a two-year determinate term for count eight. Concurrent terms were imposed with respect to counts three (15 years), nine (two years), and 10 (two years). This appeal followed.

## II. DISCUSSION

### A. *Constitutional Right to Counsel of Choice*

Franklin asserts on appeal that the judgment must be reversed because the trial court denied him his Sixth Amendment right to counsel of his choice. He claims that the error was structural, requiring reversal without consideration of prejudice or any countervailing factors. Franklin misapprehends the scope of the constitutional right he invokes.

#### 1. *Legal Framework and Standard of Review*

"The Sixth Amendment right to counsel guarantees a criminal defendant the right to choose his or her own counsel when the defendant does not need appointed counsel." (*People v. Woodruff* (2018) 5 Cal.5th 697, 728, citing *United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144 (*Gonzalez-Lopez*).) In *Gonzalez-Lopez*, the United States Supreme Court rejected the argument that this Sixth Amendment right to counsel of choice is not violated unless a defendant has been prejudiced. (*Gonzalez-Lopez*, at pp. 144–146.) Thus, "[d]eprivation of the right is 'complete' when the defendant is erroneously prevented from being represented by the lawyer [he or she] wants." (*Id.* at p. 148.) The Supreme Court also concluded that violation of the right is not subject to review for harmless error. Rather, "erroneous deprivation of the right to counsel of choice, 'with consequences

9

that are necessarily unquantifiable and indeterminate, unquestionably qualifies as "structural error." ' " (*Id.* at p. 150.)

The *Gonzalez-Lopez* Court, however, was careful to point out that the Sixth Amendment right to counsel of choice " 'is circumscribed in several important respects.' " (*Gonzalez-Lopez, supra,* 548 U.S. at p. 144.)  As is relevant here, the Court " 'recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness [citation], and against the demands of its calendar.' " (*People v. Lynch* (2010) 50 Cal.4th 693, 725, quoting *Gonzalez-Lopez*, at p. 152; see also *Morris v. Slappy* (1983) 461 U.S. 1, 11 [" 'Trial judges necessarily require a great deal of latitude in scheduling trials.' "].)  Thus, a trial court may " 'make scheduling and other decisions that effectively exclude a defendant's first choice of counsel.' " (*Gonzalez-Lopez*, at p. 152.)

A continuance of a criminal proceeding "shall be granted only upon a showing of good cause." (§ 1050, subd. (e).)  Granting or denying a motion for continuance is left to the discretion of the trial court and will be affirmed on appeal absent a showing of an abuse of discretion. (*People v. Mickey* (1991) 54 Cal.3d 612, 660.)  Reviewing courts look to the "circumstances of each case, ' "particularly in the reasons presented to the trial judge at the time the request [was] denied." ' " (*People v. Courts* (1985) 37 Cal.3d 784, 791.)

### 2.    *No Constitutional Violation is Established*

Franklin argues that once he was denied his attorney's physical presence for a single court day when Ford was required to appear remotely, the violation of his Sixth Amendment right to counsel of his choice was complete.  Thus, he claims, the judgment must be reversed for structural error and without any balancing of competing interests.  As we have just stated, however, a trial court may "make scheduling and other decisions that

10

effectively exclude a defendant's first choice of counsel," without running afoul of the Sixth Amendment. (*Gonzalez-Lopez*, *supra*, 548 U.S. at p. 152.)

Here, Franklin's first choice was understandably to have Ford physically present for every day of trial. But we do not believe the trial court's decision to proceed with trial for one day with only one of Franklin's two attorneys physically present and the other present and available remotely implicates Sixth Amendment concerns. Indeed, the *Gonzalez-Lopez* court justified its conclusion that the erroneous deprivation of the right to counsel of choice is structural error as follows: "Different attorneys will pursue different strategies with regard to investigation and discovery, development of the theory of defense, selection of the jury, presentation of the witnesses, and style of witness examination and jury argument. And the choice of attorney will affect whether and on what terms the defendant cooperates with the prosecution, plea bargains, or decides instead to go to trial. In light of these myriad aspects of representation, the erroneous denial of counsel bears directly on the 'framework within which the trial proceeds,' . . . [h]armless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." (*Id.* at p. 150.) Such is obviously not the case here.

Rather, we conclude that the trial court's decision to proceed with the trial under the circumstances presented is more properly analyzed for abuse of discretion as a denial of Franklin's request for a continuance. It is clear from the factual recitation set forth above that no abuse occurred here. In denying the continuance, the trial court heard the concerns of defense counsel; considered the comfort level of the jury and Jane Doe Three; weighed the unique concerns presented by the COVID 19 pandemic; received negative tests from Belyi and Franklin; considered Belyi's clear competence and the

11

stage of the proceedings; saw no material prejudice to Franklin; and stated its willingness to allow Belyi and Ford to communicate during the proceedings. We see no error, and certainly no abuse of discretion.

## B. *Constitutional Right to Decide to Testify in Own Defense*

Franklin next contends that his Sixth Amendment right to decide for himself whether or not to testify was violated in this case because his attorneys never explained to him that it was his choice to make. In a related argument, Franklin asserts that the trial court erred by failing to give him an express advisement on the record that the decision whether or not to testify was personal and to obtain a valid waiver. On this second point, he argues existing precedent to the contrary is no longer good law in light of the United States Supreme Court's decision in *McCoy v. Louisiana* (2018) 584 U.S. 414 (*McCoy*). We are not persuaded by either claim.

### 1. *Legal Framework and Standard of Review*

Both the Fifth Amendment of the United States Constitution and Article 1, section 15 of the California Constitution provide that criminal defendants cannot be compelled to testify as witnesses against themselves in criminal proceedings. In a related vein, the United States Supreme Court explicitly held in 1987 that criminal defendants also have "a constitutional right to testify on [their] own behalf." (*People v. Johnson* (1998) 62 Cal.App.4th 608, 617 (*Johnson*), citing *Rock v. Arkansas* (1987) 483 U.S. 44 (*Rock*); accord, *People v. Bradford* (1997) 15 Cal.4th 1229, 1332 (*Bradford*).) "The Supreme Court stated the right to testify 'is one of the rights that "are essential to due process of law in a fair adversary process" ' [citation] and was protected by the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution." (*Johnson*, at p. 617, quoting *Rock*, at pp. 51–53.)

12

Specifically, the Supreme Court explained: " 'The opportunity to testify is . . . a necessary corollary to the Fifth Amendment's guarantee against compelled testimony' since the privilege against self-incrimination ' "is fulfilled only when the accused [are] guaranteed the right 'to remain silent unless [they] choose[] to speak in the unfettered exercise of [their] own will.' . . . The choice of whether to testify in one's own defense . . . is an exercise of the constitutional privilege." ' " (*Johnson*, 62 Cal.App.4th at p. 617, quoting *Rock*, *supra*, at pp. 52-53; accord, *People v. Duong* (2020) 10 Cal.5th 36, 55 ["A criminal defendant has the right to testify at trial, 'a right that is the mirror image of the privilege against compelled self-incrimination and accordingly is of equal dignity.' "].) The *Rock* Court further found "the right to testify 'in the Compulsory Process Clause of the Sixth Amendment, which grants [] defendant[s] the right to call "witnesses in [their] favor" ' since " '[l]ogically included in the accused's right to call witnesses whose testimony is "material and favorable to [their] defense," [citation] is a right to testify [themselves], should [they] decide it is in [their] favor to do so.' " (*Johnson*, at pp. 617–618, quoting *Rock*, at p. 52.) Finally, " 'the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law [which includes the] right to be heard and to offer testimony,' necessarily includes the criminal defendant's right to testify in [his or her] own behalf." (*Johnson*, at p. 618, quoting *Rock*, at p. 51.)

The *Rock* Court further opined that "the Sixth Amendment ' "grants to the accused *personally* the right to make [his or her] defense" ' which includes the 'right to present [their] own version of events in [their] own words.' " (*Johnson*, *supra*, 62 Cal.App.4th at p. 618, italics in *Rock*.) Thus, a defendant "may exercise the right to testify over the objection of, and contrary to the advice of, defense counsel." (*Bradford*, *supra*, 15 Cal.4th at p. 1332.)

13

However, the right to testify "must be exercised with caution and good judgment, and with the advice and under the direction of competent trial counsel. It necessarily follows that a trial judge may safely assume that a defendant, who is ably represented and who does not testify is merely exercising [his or her] Fifth Amendment privilege against self-incrimination and is abiding by [defense] counsel's trial strategy." (*People v. Mosqueda* (1970) 5 Cal.App.3d 540, 545 (*Mosqueda*); accord, *People v. Enraca* (2012) 53 Cal.4th 735, 762–763 (*Enraca*) [quoting *Mosqueda*].)

Thus, our high court has repeatedly held that a trial court is not required to "obtain an affirmative waiver on the record whenever a defendant fails to testify at trial." (*People v. Acala* (1992) 4 Cal.4th 742, 805; accord, *People v. Bradford* (1997) 14 Cal.4th 1005, 1052–1053 [same and distinguishing the right to a jury trial because Cal. Const., art. I, § 16 expressly requires a personal waiver of the jury trial right from the defendant]; *Bradford*, *supra*, 15 Cal.4th at p. 1332 [trial court has no sua sponte duty to inform a defendant of his or her "right to testify, or to obtain his personal waiver of that right"]; see also *People v. Hayes* (1991) 229 Cal.App.3d 1226, 1232 ["[t]he waiver of the right to testify may be made by counsel, and the courts have wisely refused to impose a sua sponte obligation on the trial court to extract a personal waiver from the defendant"].)

In 2012, the Supreme Court reaffirmed these previous decisions, again opining that a trial court has no duty to give advice or seek an explicit waiver regarding a defendant's right to testify, unless a conflict with counsel comes to the court's attention. (*Enraca*, *supra*, 53 Cal.4th at p. 762.) Specifically, our high court rejected the argument "that requiring an advisement and explicit waiver, even in the absence of a conflict, 'would not only protect [a] defendant's fundamental constitutional right to testify, but also ease the

14

burden on the judicial system' by obviating the need for posttrial evidentiary hearings on the question of waiver." (*Ibid.*)  In doing so, the Court noted: "When the record fails to disclose a timely and adequate demand to testify, 'a defendant may not await the outcome of the trial and then seek reversal based on [a] claim that despite expressing to counsel [a] desire to testify, [the defendant] was deprived of that opportunity.' " (*Id.* at pp. 762–763.)

"On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard.  [Citation.]  Its ruling will not be disturbed unless defendant establishes 'a "manifest and unmistakable abuse of discretion." ' " (*People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27 (*Hoyos*), overruled in part on another ground in *People v. Black* (2014) 58 Cal.4th 912, 919–920.)  "We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." (*People v. Nesler* (1997) 16 Cal.4th 561, 582; accord *People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.)  However, with respect to constitutional questions, such as that at issue here, "the asserted abuse of discretion is the asserted failure of the trial court to recognize violations of defendant's constitutional rights." (*Hoyos*, at p. 917, fn. 27.)  In other words, our review of the constitutional claim is de novo.

## 2.   *No Sixth Amendment Violation is Established*

### i. *Defendant Was Adequately Advised By Counsel*

Franklin's first argument—that he was not adequately advised of his right to decide for himself whether or not to testify—is easily dismissed.  As stated above, the court found Belyi and Ford credible, and we must accept the trial court's credibility determinations.  The testimony of Ford and Belyi supplies substantial evidence that they advised Franklin on multiple occasions that it was ultimately his choice whether or not to testify in his own

15

defense. Franklin does nothing to refute these core facts. He asserts that the jail house call supports his testimony that he believed the decision regarding whether he would testify was the " 'business' of his attorneys" rather than his own choice. But the call is, at best, ambiguous. And he claims that he only went along with Belyi's "last minute" plea to " 'listen to us right now' " because he assumed his attorneys had not prepared to put him on the stand. Even if this were true, it does not overcome the credible statements of Ford and Belyi that they each advised him of his right to testify *more than once*. In short, the record does not show that Franklin's attorneys failed to advise him properly regarding his right to take the stand, and thus the trial court did not abuse its discretion in denying Franklin's new trial motion on that basis.[3]

### ii. *Trial Court Had No Duty to Seek an Explicit Waiver*

The second part of Franklin's argument in this context is that we should ignore decades of precedent concluding that a trial court has no duty to give advice or seek an explicit waiver regarding a defendant's right to testify based on the United States Supreme Court's decision in *McCoy, supra*, 584 U.S. 414. We decline to do so. Even while presenting this argument, Franklin concedes that the *McCoy* case does not specifically deal with a

---

[3] By failing to demand on the record the right to testify in his own defense, Franklin has arguably forfeited the issue. (See *Enraca, supra*, 53 Cal.4th at pp. 762–763.) However, since the trial court held a hearing and considered the merits of the claim in denying the new trial motion—and because we must address the constitutional issue regardless—we address and reject the argument on the merits.

16

defendant's decision to testify. It is just listed as a right reserved " 'for the client.' "

In brief, the Court explained that the Sixth Amendment guarantees a defendant the right to make a defense; it " 'speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant.' " (*McCoy*, *supra*, 584 U.S. at p. 421.) While some decisions, such as trial management, are best left to counsel, "[s]ome decisions . . . are reserved for the client—notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*Id.* at p. 422.)

Although *McCoy* listed the right to testify in one's own defense among those trial decisions that are reserved for the client, it did so only to add another right to that list—the right of a defendant to maintain his or her innocence at trial. *McCoy* did not consider whether a trial court must advise and/or seek an explicit waiver on the record to preserve said rights. Further, nothing in *McCoy* suggests that all of the listed decisions reserved for a defendant in a criminal case—whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, forgo an appeal, and maintain innocence—must be treated identically in all respects. For example, as is relevant here, a number of courts have rejected the procedural rule Franklin argues is required here because the right to testify is so inextricably tied to the Fifth Amendment right against self-incrimination. "To require the trial court to follow a special procedure, explicitly telling defendant about, and securing an explicit waiver of, a privilege *to* testify (whether administered within or outside the jury's hearing), could inappropriately influence the defendant to waive [his or her] constitutional right *not* to testify, thus threatening the exercise of this other, converse, constitutionally explicit, and more fragile right." (*Siciliano v. Vose* (1st Cir. 1987) 834 F.2d 29, 30 (opn. of

Bryer, J.); accord, *United States v. Rodriguez-Arpacio* (5th Cir. 2018) 888 F.3d 189, 193–194; *Brown v. Graham* (W.D.N.Y. 2011) 2011 U.S. Dist. LEXIS 87879 at pp. 14–16; see generally *State v. Morel-Vargas* (Conn. 2022) 273 A.3d 661, 672–675.)  In sum, nothing in *McCoy* mandates we reject existing precedent in this context, and we are therefore bound to follow it.  (*People v. Landry* (1996) 49 Cal.App.4th 785, 791.)

## III.  DISPOSITION

The judgment is affirmed.

LANGHORNE WILSON, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A165893